**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| In re:<br><br>NSPIRE HEALTH, INC.<br>EIN: 84-1153246,<br><br>Debtor. | Case No. 19-13271-MER<br><br>Chapter 11 |
|---|---|
| In re:<br><br>NSPIRE HEALTH, LLC.<br>EIN: 20-8754321,<br><br>Debtor. | Case No. 19-13273-MER<br><br>Chapter 11<br><br>**Jointly Administered in<br>Case No. 19-13271-MER** |

**FINAL ORDER (I) AUTHORIZING DEBTOR NSPIRE HEALTH, INC. TO OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; AND (III) SCHEDULING A FINAL HEARING**

Upon the motion, dated December 19, 2019 (the "**DIP Motion**"), of the debtors and debtors-in-possession (collectively, the "**Debtors**"), in the above-referenced chapter 11 cases (the "**Cases**"), seeking entry of a final order (this "**Final Order**") pursuant to sections 105, 363(b), 364(c)(1), 364(c)(2), 364(d)(1), 364(e), and 507 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 4001-2, and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Colorado (the "**Local Rules**"), that, among other things:

(i)     authorizes nSpire Health, Inc. (the "**Borrower**") to obtain a revolving loan facility up to $1,200,000 pursuant to the terms of the Loan and Security Agreement, dated as of December 19, 2019, among the Borrower and Lender (the "**DIP Credit Agreement**"); [1]

(ii)    authorizes the Borrower to grant John C Head III, in his individual capacity (the "**Lender**"), pursuant to sections 364(c)(1), 364(c)(2), and 364(d) of the Bankruptcy Code, a senior secured priming and superpriority lien on substantially all of the Borrower's assets to secure the Borrower's obligations to the Lender under the DIP Credit Agreement;

(iii)   provides for the immediate effectiveness of the Final Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness; and

(iv)    authorizes the Borrower to make the payments contemplated by the Budget (attached to the DIP Credit Agreement as Exhibit A).

Having considered the DIP Motion, the DIP Credit Agreement, the Affidavit of John R. Peterson in Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtor nSpire Health, Inc. to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Claims; And (III) Scheduling a Final Hearing; and in accordance with Bankruptcy Rules 2002, 4001, 6004, and 9014 and all applicable Local Rules, notice of the DIP Motion and the hearing to consider the DIP Motion on a final basis (the "**Final Hearing**") having been provided pursuant to the Court's Order Granting Ex Parte Motion of Debtors to Limit Notice in These Cases, Including Notice with Respect to Their Motion to Extend Exclusive Period to File Plan of Reorganization (Docket No. 76); and it appearing that approval of the final relief requested in the DIP Motion is is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement is a sound and prudent exercise of the

---

[1] Unless provided otherwise, capitalized terms that are not defined in this order have the meaning provided in the DIP Credit Agreement.  A copy of the DIP Credit Agreement is attached hereto as **Exhibit A**.

Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]**

    A.     **Jurisdiction and Venue**. This Court has core jurisdiction over the Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and other predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and the Local Rules.

    B.     **Notice**. The notice of the DIP Motion and the Final Hearing is appropriate and sufficient under the circumstances.

    C.     **Findings Regarding the DIP Credit Agreement**.

    (i)     <u>Need for Postpetition Financing</u>. The Debtors have an immediate need to obtain funds under the DIP Credit Agreement to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, to enter into a new lease agreement with GCC Longmont Holdings, Limited Partnership and to otherwise preserve the value of the Debtors' estates. The Debtors' access to sufficient working capital and liquidity is vital to a successful reorganization of the Debtors.

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

20182805.1

(ii)        <u>No Credit Available on More Favorable Terms</u>.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the Lender.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without granting to the Lender the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Credit Agreement.

D.        **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)        The terms and conditions of the DIP Credit Agreement, and the fees are fair, reasonable, and the best available under the circumstances, and the Debtors' agreement to the terms and conditions of the DIP Credit Agreement and to the payment of such fees reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  Such terms and conditions are supported by reasonably equivalent value and fair consideration.

(ii)        The Debtors and Lender, with the assistance and counsel of their respective advisors, have acted in good faith and at arms' length in, as applicable, negotiating, consenting to, or agreeing to, the DIP Credit Agreement.

E.        **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2), and the Local Rules.  Absent granting the relief set forth in this Final Order, the Debtors' ability to successfully reorganize will be immediately and irreparably harmed.  Consummation of the DIP Credit Agreement is therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.  Based on all of the foregoing, sufficient cause exists for immediate entry

4

of the Final Order pursuant to Bankruptcy Rule 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based on the DIP Motion and the record before this Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.      **Motion Granted**.  The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Final Order and the DIP Credit Agreement.  Any objections to the DIP Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.      **DIP Credit Agreement and DIP Protections**.

(a)      Approval of DIP Credit Agreement.  The Debtors are expressly and immediately authorized to establish the DIP Credit Agreement, to execute, deliver, and perform under the DIP Credit Agreement and this Final Order.  The Debtors are hereby authorized and directed to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement as such become due pursuant to the DIP Credit Agreement and this Final Order.  Upon their execution and delivery, the DIP Credit Agreement shall represent the legal, valid, and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms.  Each officer of a Debtor is hereby authorized to execute and deliver the DIP Credit Agreement, and any document necessary to effectuate the terms of the DIP Credit Agreement and this Final Order, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

(b)      <u>DIP Obligations</u>.  The term "**DIP Obligations**" shall mean all amounts and other obligations and liabilities owing by the Borrower under the DIP Credit Agreement and shall include the principal of, interest on, and fees owing in respect of, such amounts, and any obligations in respect of indemnity claims, whether contingent or otherwise.

(c)      <u>Authorization to Incur DIP Obligations</u>.  The Borrower is hereby authorized to borrow under the DIP Credit Agreement; <u>provided</u> that (i) the aggregate outstanding amount for all such borrowings shall not exceed $1,200,000; and (ii) any proposed use of the proceeds of the Loans shall be consistent with the Budget.  All DIP Obligations shall be unconditionally guaranteed by the Borrower, as further provided in the DIP Credit Agreement.

(d)      <u>Conditions Precedent</u>.  The Lender shall have no obligation to extend credit under the DIP Credit Agreement unless and until all conditions precedent to the extension of credit under the DIP Credit Agreement and this Final Order have been satisfied in full or waived by the Lender in accordance with the DIP Credit Agreement.

(e)      <u>DIP Liens</u>.  As security for the DIP Obligations, effective as of the date of this order, the following Liens, which shall immediately and without any further action by any person be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable upon the entry of this Final Order, are hereby granted by the Debtors to the Lender on substantially all of the Borrower's assets and properties and all proceeds, products, accessions, rents, and profits thereof, and the Borrower's domain names and bank account, in each case whether now owned or existing or hereafter acquired or arising (the "**Collateral**").  Subject to the Permitted Liens and the Carve-Out (both terms as defined herein), the Liens shall have priority over other liens on the Borrower's property, whether now owned or existing or hereafter acquired or arising, and current

6

and future administrative expenses in these Cases pursuant to sections 364(c)(2), 364(c)(1), and 364(d) of the Bankruptcy Code.

(f)     Notwithstanding the foregoing, the Liens shall be junior to tax liens and mechanics liens against the Borrower's assets (the "**Permitted Liens**") and (a) all unpaid fees required to be paid in these Cases to the clerk of the United States Bankruptcy Court for the District of Colorado and to the office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (b) the reasonable unpaid fees, costs, and disbursements of professionals retained by the Debtors in these Cases that are incurred prior to the delivery by the Lender of a default notice under this Agreement ((a) and (b) collectively, the "**Carve-Out**").

3.     **Disposition of Collateral; Credit Bid**.

(a)     The Lender (or one or more of its designees, affiliates or assignees) shall have the unqualified right to credit bid any or all of the DIP Obligations under or pursuant to section 363 of the Bankruptcy Code or any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code.

(b)     If the Lender makes a credit bid in connection with any auction or other sale process relating to the sale or other disposition of any Collateral, then for purposes of such auction or sale process or any applicable order of this Court, the Lender shall be automatically deemed to be a qualified bidder and its bid shall be automatically deemed to constitute a qualified bid, regardless of whether the qualified bidder or qualified bid requirements are satisfied.

4.     **Restriction on Use of Proceeds**.     Notwithstanding anything herein to the contrary, no loans or proceeds from the DIP Credit Agreement may be used by (a) any Debtor, a committee, if one is formed, or trustee or other estate representative appointed in the Cases or

20182805.1

upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "**Successor Case**"), or any other person, party, or entity to prosecute or challenge the Liens or obligations owed to Lender under the DIP Credit Agreement or this Final Order or to bring actions arising under chapter 5 of the Bankruptcy Code against the Lender or any of the Lender's affiliates.

5.      **No Marshaling**.  Subject to entry of a Final Order, the Lender shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

6.      **Amendments**.   The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Credit Agreement in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver increases the aggregate lending commitments under the DIP Credit Agreement to more than $1,200,000, shortens the Maturity Date, or adds or amends (in any respect unfavorable to the Debtors) any Event of Default.  No waiver, modification, or amendment of any of the provisions of the DIP Credit Agreement shall be effective unless set forth in writing, signed by or on behalf of the Borrower and the Lender and, except as provided herein, approved by this Court.

7.      **Inconsistency**.   In the event of any inconsistency between the terms and conditions of the DIP Credit Agreement and of this Final Order, the provisions of this Final Order shall govern and control.

8.      **Enforceability**.  This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon execution hereof.   This Final Order shall be immediately effective and

8

enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Final Order.

9.      **Headings**.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Final Order.

10.      **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce this Final Order according to its terms.

Dated:  January 24, 2020
          Denver, Colorado

_____
United States Bankruptcy Judge

# Exhibit A

# LOAN AND SECURITY AGREEMENT

by and among

**NSPIRE HEALTH, INC.,**
as the Borrowers

and

**JOHN C HEAD III**,
as the Lender

Dated as of December 19, 2019

## LOAN AND SECURITY AGREEMENT

This loan and security agreement (the "**Agreement**"), dated as of December 18, 2019, is among nSpire Health, Inc., as borrower (together, the "**Borrower**"), and John C Head III, as lender (the "**Lender**").

## RECITALS

**WHEREAS**, on April 22, 2019 (the "**Petition Date**"), the Borrower filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Colorado (the "**Bankruptcy Court**").

**WHEREAS**, from and after the Petition Date, the Borrower continues to operate its businesses and manage its property as debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, the Borrower has requested the Lender to provide a discretionary revolving loan facility (the "**DIP Loan Facility**") in an aggregate principal amount not to exceed $1,200,000, the proceeds of which will be used to provide working capital from time to time for the Borrower, to fund the administration of the Debtors chapter 11 cases (the "**Cases**"), and for other general corporate purposes in accordance with the Budget (as defined herein).

## AGREEMENT

Now, therefore, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

1.      **Amount of Loan/Advances**

The maximum aggregate principal amount of the Loan shall be $1,200,000 (the "**Maximum Loan Amount**"), which sums shall be loaned as follows:

      a.   Upon entry of an order (the "**Interim Order**") from the Bankruptcy Court granting on an interim basis the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Claims; and (III) Scheduling a Final Hearing (the "**DIP Motion**"), and upon satisfaction of all conditions and requirements of this Agreement, the Lender shall advance to the Debtors and amount up to $590,000 (the "**Interim Advancement**") to be used in accordance with the budget of projected expenses (the "**Budget**") attached hereto as **Exhibit A**.

      b.   Upon entry of an order (the "**Final Order**") from the Bankruptcy Court granting on an interim basis the DIP Motion, and upon satisfaction of all conditions and requirements of this Agreement, the Lender, in its discretion and without further order of the Bankruptcy Court, may make advancements ("**Additional Advancements**," and together with the Interim Advancement, the "**Loan**") in addition to the Interim Advancement.  The total principal amount provided in the

Interim Advancement and any Additional Advancements shall not exceed the Maximum Loan Amount, to be used in accordance with the Additional Advancement Budget (as defined herein).

## 2.    Conditions Precedent

Unless the Lender agrees otherwise, the Lender shall not be obligated to fund the Initial Advancement if, prior to funding the Initial Advancement, (i) the Cases have been converted to cases under chapter 7 of the Bankruptcy Code; (ii) the Cases have been dismissed; (iii) a trustee has been appointed to administer the Cases while in chapter 11 of the Bankruptcy Code; or (iv) the Interim Order does not grant the Lender a security interest in the Collateral (as defined herein) consistent with the terms of this Agreement.

The Lender shall have full discretion regarding whether to fund Additional Advancements. Prior to funding Additional Advancements, the Borrower shall provide the Lender with a budget covering the period for which the Additional Advancements are sought (an "**Additional Advancement Budget**").

## 3.    Interest

The interest rate on Loans shall accrue at a rate equal to 60-day LIBOR plus 4.5% per annum during the period such Loan remains outstanding.

## 4.    Term

The term of this Agreement shall be the earlier of (a) 120 days from closing ("**Initial Maturity**"), unless extended as outlined below, (b) any substantial reorganization of the Borrower pursuant to a plan of reorganization confirmed by the Court, or (c) the occurrence of a material an Event of Default that is not cured within a reasonable time after the Borrower becomes aware of the Event of Default.

This Agreement may be extended by the Borrower for a period of 3 months from the Initial Maturity ("**Extended Maturity**"). The later of the Initial Maturity or Extended Maturity is the "**Maturity Date**")

Upon the Maturity Date and written confirmation by the Lender that all obligations have been paid in full, all Liens granted pursuant to this Agreement shall terminate.

## 5.    Grant of Security Interest

To secure the Borrower's obligations to repay the Loan and any interest under this Agreement to the Lender, the Borrower hereby grants and pledges to the Lender a security interest and a superpriority claim (collectively, the "**Liens**") on substantially all of the Borrower's assets and properties and all proceeds, products, accessions, rents, and profits thereof, and the Borrower's domain names and bank account, in each case whether now owned or existing or hereafter acquired or arising (the "**Collateral**"). Subject to the Permitted Liens and the Carve-Out (both terms as defined herein), the Liens shall have priority over other liens on the Borrower's property, whether now owned or existing or hereafter acquired or arising, and current

2

20035695.

or future administrative expenses in these Cases pursuant to sections 364(c)(2), 364(c)(1), 364(c)(3), and 364(d) of the Bankruptcy Code.

Notwithstanding the foregoing, the Liens shall be junior to tax liens and mechanics liens against the Borrower's assets (the "**Permitted Liens**") and (a) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a)(6); and (b) the reasonable unpaid fees, costs, and disbursements of professionals retained by the Debtors in these Cases that are incurred prior to the delivery by the Lender of a default notice under this Agreement ((a) and (b) collectively, the "**Carve-Out**").

**6.     Fees**

The Borrower agrees to pay to the Lender on the Closing Date a closing fee equal to $50,000.

**7.     Mandatory Repayment**

Unless the Lender agrees otherwise, the Loans and all interest accrued under this Agreement shall be due and payable upon the Maturity Date.

**8.     Voluntary Prepayment**

The Borrower shall have the right to prepay Loans without premium or penalty in whole or in part from time to time so long as the Borrower gives the Lender written notice of its intent to make such repayment and the intended amount of such repayment.

**9.     Events of Default**

Listing of Events of Default.  Each of the following events or occurrences shall constitute an "**Event of Default**":

a.     Non-Payment of Obligations.  The Borrower shall default in the payment of principal or interest of any Loan when such amount is due.

b.     Budget.  The Borrower, without approval from the Lender, shall exceed by more than 20% the total projected expenses contained in the Budget or Additional Advancement Budgets.

c.     Breach of Warranty.  Any representation or warranty by the Borrower made in this Agreement is or shall be incorrect in any material respect when made or deemed to have been made.

d.     Impairment of Security, etc.  Any Lien, in whole or in part, terminates, ceases to be effective or perfected or ceases to be a legally valid, binding, and enforceable obligation of the Borrower.

e.     Change of Control.  (a) the Lender shall, together with its affiliates, at any time fail to have or exercise the power to elect a majority of the board of directors or

3

another managing body of nSpire Health, LLC, (b) the Lender, together with its affiliates, shall at any time, directly or indirectly, fail to own beneficially and of record, on a fully diluted basis, more than 50.1% of the outstanding membership interests with the power to vote of nSpire Health, LLC, or (c) nSpire Health, LLC shall at any time, directly or indirectly, own beneficially and of record, on a fully diluted basis, less than 100% of the membership interests in nSpire Health, Inc.

f.   <u>Bankruptcy Defaults</u>.  The occurrence of any of the following in these Cases:

    i.   the entry of an order by the Bankruptcy Court authorizing the solicitation of a plan of reorganization of liquidation by a plan proponent other than the Borrower or the Lender;

    ii.   without the prior written consent of the Lender, the dismissal of the Cases or the conversion of the Cases to one or more cases under chapter 7 of the Bankruptcy Code;

    iii.   the entry of an order which has not been withdrawn, dismissed, or reversed (a) appointing an interim or permanent trustee in the Cases or the appointment of an examiner with expanded powers in the Cases, (b) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a lien on any Collateral or any other property or assets of the Borrower, in either case in excess of $100,000 or (y) with respect to any lien of, or the granting of any lien on any Collateral or any other property or assets of the Borrower to, any state or local environmental or regulatory agency or authority, in each case with a value in excess of $100,000, (c) amending, supplementing, staying, reversing, vacating, or otherwise modifying any of the Interim Order, Final Order, or this Agreement or Lender' rights, benefits, privileges or remedies under the Interim Order, Final Order, or this Agreement, or (d) approving a sale of any assets of the Borrower pursuant to section 363 of the Bankruptcy Code or approving bidding procedures therefor, other than any such order that is satisfactory to the Lender in its sole discretion;

    iv.   the marshaling of any Collateral; and

    v.   the filing of any plan of reorganization or liquidation or disclosure statement attendant thereto by the Borrower that is not on terms acceptable to the Lender in its sole discretion.

## 10.   Remedies Upon Event of Default

If any Event of Default shall occur for any reason, whether voluntary or involuntary, and be continuing, the Lender may by notice to the Borrower declare all or any portion of the outstanding principal amount of the Loans to be due and payable, whereupon the full unpaid amount of such Loans that shall be so declared due and payable shall be and become

immediately due and payable, without further notice, demand, or presentment.  The Lender shall have all other rights and remedies available at law or in equity.

## 11.    Borrower's Covenants

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until the Loans, together with fees and interest hereunder, are paid in full in accordance with the terms of this Agreement:

a.    <u>Financial Statements</u>.  The Borrower shall provide the Lender (i) unaudited consolidated balance sheets of the Borrower, (ii) unaudited consolidated statements of income and cash flow of the Borrower, or (iii) unaudited consolidated 12-week budget within 5 business days of a written request from the Lender for such information.

b.    <u>Notice of Default</u>.  As soon as possible and in any event within 3 business days after the Borrower or an agent thereof obtain knowledge thereof, the Borrower shall provide the Lender a notice of the occurrence of any event that constitutes a Default or an Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the applicable the Borrower proposes to take with respect thereto.

c.    <u>Books, Records, and Inspections</u>.  The Borrower will maintain proper books of record and account, in which entries that are full, true and correct in all material respects.  Upon reasonable prior notice, during the Borrower's normal business hours and at any other time agreed upon by the Borrower and the Lender, the Borrower will permit representatives of the Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Borrower.

d.    <u>Use of Proceeds</u>.  The proceeds of the Loans shall be used, in all cases, in accordance with and as set forth in the Budget or the Additional Advancement Budget, as applicable.

e.    <u>Chapter 11 Cases</u>.  The Borrower will use commercially reasonable efforts to obtain the approval of the Bankruptcy Court of this Agreement.

## 12.    Assignment

The Lender may assign any or all of its obligations and rights hereunder to one or more assignees or participants with the prior written approval of the Borrower—which approval shall not be unreasonably withheld.  The Borrower agree to execute any and all agreements and other documents reasonably requested by the Lender to formalize such assignments of its rights hereunder.

20035695.

13.    **Usury**

At no time shall the Borrower be obligated or required to pay interest at a rate which could subject the Lender or its assignees to either civil or criminal liability as a result of being in excess of the maximum rate which the Borrower is permitted by law to contract or agree to pay. If by the terms of this Agreement, the Borrower is at any time required or obligated to pay interest at a rate in excess of such maximum rate, the rate of interest hereunder shall be deemed to be immediately reduced to such maximum rate and interest payable shall be computed at such maximum rate and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of principal balance or, if the Loan has not closed shall be void, and if Lender deems it a hardship to close the Loan under usury statutes, all fees paid to the Lender shall be refunded and this Agreement shall be null and void.

14.    **Governing Law & Jurisdiction**

The governing law for this Agreement is that of the State of Colorado.  The Bankruptcy Court shall have exclusive jurisdiction to hear and resolve any disputes regarding this Agreement.

15.    **Execution and Reliance on Counsel**

This Agreement may be executed in counterparts which, taken together, shall constitute one original.  This Agreement is for the benefit of the Borrower only and may not be assigned except upon the prior written consent of the Lender, which consent may be withheld for any reason or for no reason.  No party other than the Borrower, or an assignee acceptable to Lender may rely upon the terms and conditions of this Agreement.  This Agreement is executed by an individual strictly in his capacity as a representative of the Lender.  By acceptance of this Agreement, the Borrower agrees that no representative, member, partner, shareholder, employee, or agent of the Lender shall be personally liable for the payment of any claim or performance of any obligations hereunder.

The Borrower and Lender had the benefit of the advice of counsel in connection with the execution of this Agreement and the Loan contemplated hereby. This document has been negotiated at arm's length and in good faith between the Lender and the Borrower.

16.    **No Waiver**

No failure or delay on the part of the Lender to exercise any rights hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Lender of any right hereunder preclude any further exercise thereof, or the exercise of any other right.  Each and every right or remedy granted hereunder or under any document delivered thereunder or in connection therewith or allowed to the Lender in law or equity shall be deemed cumulative and may be exercised from time to time.

20035695.

### 17.     Amendments

No amendment to the terms of this Agreement shall be enforceable unless in writing and signed by the Borrower and the Lender.

### 18.     Notices

Unless otherwise provided, all written notices required hereunder may be provided by email, first-class mail, or overnight mail.

### 19.     Severability

Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

### 20.     Integration

This Agreement represents the agreement of the Borrower and Lender with respect to the subject matter hereof, and there are no promises, undertakings, representations, or warranties by any party hereto relative to the subject matter hereof not expressly set forth or referred to herein. In the event of any conflict between the terms of the Interim Order or Final Order and any other Credit Document, the terms of the Interim Order or Final Order shall govern.

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

**nSpire Health, Inc.,**
as Borrower

By: _____
Name: John R. Peterson
Title:   Interim CEO

**John C Head III,**
as lender

By: _____
Name:  John C Head III

Signature Page to Senior Credit and Security Agreement

20035695.6

# Exhibit A

**nSpire DIP**
**13 Week Projection**
As of December 19, 2019

| Position | 12/16/2019 | 12/23/2019 | 12/30/2019 | Month | 1/6/2020 | 1/13/2020* | 1/20/2020* | 1/27/2020* | Month | 2/3/2020* | 2/10/2020 | 2/17/2020 | 2/24/2020 | Month | 3/2/2020 | 3/19/2020 | Month | Total 13 Wk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Personnel** | | | | | | | | | | | | | | | | | | |
| Device Manager | $4,250 | $4,250 | $4,250 | $12,750 | $4,250 | $4,250 | $4,250 | $4,250 | $17,000 | $4,250 | $4,250 | $4,250 | $4,250 | $17,000 | $4,250 | $4,250 | $8,500 | $55,250 |
| Assembly/Manufacturing 1 | | | | | | | | | | $865 | $865 | $865 | $865 | $3,460 | $865 | $865 | $1,730 | $5,190 |
| Assembly/Manufacturing 2 | | | | | | | | | | $865 | $865 | $865 | $865 | $3,460 | $865 | $865 | $1,730 | $5,190 |
| Assembly/Manufacturing 3 | | | | | | | | | | $865 | $865 | $865 | $865 | $3,460 | $865 | $865 | $1,730 | $5,190 |
| Warehouse/Shipping | | | | | | | | | | $865 | $865 | $865 | $865 | $3,460 | $865 | $865 | $1,730 | $5,190 |
| Sustainability Engineer | $495 | $495 | $495 | $1,485 | $1,980 | $1,980 | $1,980 | $1,980 | $7,920 | $1,980 | $1,980 | $1,980 | $1,980 | $7,920 | $1,980 | $1,980 | $3,960 | $21,285 |
| Vendor Manufacturing | | | | | | | | | | | | | | | | | | |
| Purchasing | $560 | | $560 | $1,120 | $560 | $560 | $560 | $560 | $2,240 | $560 | $560 | $560 | $560 | $2,240 | $560 | $560 | $1,120 | $6,720 |
| **Regulatory Manager** | | | | | | | | | | | | | | | | | | |
| Regulatory | $495 | $495 | $495 | $1,485 | $495 | $495 | $495 | $495 | $1,980 | $495 | $495 | $495 | $495 | $1,980 | $495 | $495 | $990 | $6,435 |
| Regulatory | | | | | | | | | | | | | | | $1,508 | $1,508 | $3,016 | $3,016 |
| Business Manager | $2,475 | $2,475 | $2,475 | $7,425 | $2,475 | $2,475 | $2,475 | $2,475 | $9,900 | $2,475 | $2,475 | $2,475 | $2,475 | $9,900 | $2,475 | $2,475 | $4,950 | $32,175 |
| Customer Service 1 | $1,400 | $1,400 | $1,400 | $4,200 | $1,400 | $1,400 | $1,400 | $1,400 | $5,600 | $1,400 | $1,400 | $1,400 | $1,400 | $5,600 | $1,400 | $1,400 | $2,800 | $18,200 |
| Customer Service 2 | | | | | | | | | | | | | | | $1,400 | $1,400 | $2,800 | $2,800 |
| Dealer Management | | | | | | | | | | | | | | | | | | |
| Sales | | | | | | | | | | | | | | | | | | |
| Mkting & Communications | | | | | | | | | | | | | | | | | | |
| IT/Software  Manager | $2,538 | $2,538 | $2,538 | $7,614 | $2,538 | $2,538 | $2,538 | $2,538 | $10,152 | $3,000 | $3,000 | $3,000 | $3,000 | $12,000 | $3,000 | $3,000 | $6,000 | $35,766 |
| Corp IT & Device Software | $2,538 | $2,538 | $2,538 | $7,614 | $2,538 | $2,538 | $2,538 | $2,538 | $10,152 | $2,538 | $2,538 | $2,538 | $2,538 | $10,152 | $2,538 | $2,538 | $5,076 | $32,994 |
| **Total Operating Personnel** | $14,751 | $14,191 | $14,751 | $43,693 | $16,236 | $16,236 | $16,236 | $16,236 | $64,944 | $19,293 | $19,293 | $19,293 | $19,293 | $77,172 | $23,066 | $23,066 | $46,132 | $231,941 |
| **Administrative Personnel** | | | | | | | | | | | | | | | | | | |
| AR | | | | | | $938 | $938 | $938 | $2,814 | $938 | $938 | $938 | $938 | $3,752 | $938 | $938 | $1,876 | $8,442 |
| AP | | | | | | | | $938 | $938 | $938 | $938 | $938 | $938 | $3,752 | $938 | $938 | $1,876 | $6,566 |
| Finance Manager | $1,500 | $1,500 | $1,500 | $4,500 | $1,500 | $1,500 | $1,500 | $1,500 | $6,000 | $1,500 | $1,500 | $1,500 | $1,500 | $6,000 | $1,500 | $1,500 | $3,000 | $19,500 |
| VP Operations | $5,100 | $5,100 | $5,100 | $15,300 | $5,100 | $5,100 | $5,100 | $5,100 | $20,400 | $5,100 | $5,100 | $5,100 | $5,100 | $20,400 | $5,100 | $5,100 | $10,200 | $66,300 |
| CEO | $5,200 | $5,200 | $5,200 | $15,600 | $5,200 | $5,200 | $5,200 | $5,200 | $20,800 | $5,200 | $5,200 | $5,200 | $5,200 | $20,800 | $5,200 | $5,200 | $10,400 | $67,600 |
| **Total Administrative Personnel** | $11,800 | $11,800 | $11,800 | $35,400 | $11,800 | $12,738 | $12,738 | $13,676 | $50,952 | $13,676 | $13,676 | $13,676 | $13,676 | $54,704 | $13,676 | $13,676 | $27,352 | $168,408 |
| **Consultants** | | | | | | | | | | | | | | | | | | |
| Eng. Reliability/Design | $1,875 | $1,875 | $1,875 | $5,625 | $1,875 | $1,875 | $1,875 | $1,875 | $7,500 | $1,875 | $1,875 | $1,875 | $1,875 | $7,500 | $1,875 | $1,875 | $3,750 | $24,375 |
| Device Manufacturing | $572 | $572 | $572 | $1,716 | $572 | $572 | $572 | $572 | $2,288 | $572 | $572 | $572 | $572 | $2,288 | $572 | $572 | $1,144 | $7,436 |
| Medical Advisor | | | | | | $4,500 | | | $4,500 | | | | | | | | | $4,500 |
| IT System Mapping | $375 | $375 | $375 | $1,125 | $375 | $375 | | | $750 | | | | | | | | | $1,875 |
| Temp Laborers - Moving | | | $500 | $500 | $1,500 | $1,500 | $1,500 | $500 | $5,000 | | | | | | | | | $5,500 |
| **Total Consultants** | $2,822 | $2,822 | $3,322 | $8,966 | $4,322 | $8,822 | $3,947 | $2,947 | $20,038 | $2,447 | $2,447 | $2,447 | $2,447 | $9,788 | $2,447 | $2,447 | $4,894 | $43,686 |
| **Total Personnel Expenses** | $30,673 | $28,813 | $31,748 | $91,234 | $32,858 | $38,296 | $33,421 | $33,359 | $137,934 | $35,416 | $35,416 | $35,416 | $35,416 | $141,664 | $39,189 | $44,064 | $83,253 | $454,085 |
| **Administrative Expenses** | | | | | | | | | | | | | | | | | | |
| Rent | $5,417 | $5,417 | $5,417 | $16,251 | $5,417 | $5,417 | $5,417 | $5,417 | $21,668 | $5,417 | $5,417 | $5,417 | $5,417 | $21,668 | $5,417 | $5,417 | $10,834 | $70,421 |
| Utility & Bldg Maint Cost | $2,000 | $2,000 | $2,000 | $6,000 | $2,000 | $2,000 | $2,000 | $2,000 | $8,000 | $2,000 | $2,000 | $2,000 | $2,000 | $8,000 | $2,000 | $2,000 | $4,000 | $26,000 |
| Insurance | $2,500 | $2,500 | $2,500 | $7,500 | $2,500 | $2,500 | $2,500 | $2,500 | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 | $10,000 | $2,500 | $2,500 | $5,000 | $32,500 |
| Legal Expenses | $20,000 | | | $20,000 | | | | $10,000 | $10,000 | | | | $10,000 | $10,000 | $10,000 | | $10,000 | $50,000 |
| Supplies | $500 | $500 | $500 | $1,500 | $500 | $500 | $500 | $500 | $2,000 | $500 | $500 | $500 | $500 | $2,000 | $500 | $500 | $1,000 | $7,500 |
| Shipping | $1,250 | $1,250 | $1,250 | $3,750 | $1,500 | $1,500 | $1,500 | $1,500 | $6,000 | | $1,500 | $1,500 | | $3,000 | $1,800 | $1,800 | $3,600 | $16,350 |
| Communication Expense | $625 | $625 | $625 | $1,875 | $625 | $625 | $625 | $625 | $2,500 | $625 | $625 | $625 | $625 | $2,500 | $625 | $625 | $1,250 | $8,125 |
| Server Costs | | | | | | | | | | | $1,250 | $1,250 | $1,250 | $3,750 | $1,250 | $1,250 | $2,500 | $6,250 |
| Software Licenses | | | | | | | | $6,250 | $6,250 | $6,250 | | | | $6,250 | $6,250 | | $6,250 | $18,750 |
| Travel | | $2,500 | | $5,000 | | | | $6,000 | $6,000 | | | | $2,400 | $7,200 | $2,400 | | $2,400 | $20,600 |
| Marketing & Advertising | | | | | | | | | | | | | $750 | $750 | $750 | $750 | $1,500 | $2,250 |
| Miscellaneous | $1,250 | $1,250 | $1,250 | $3,750 | $1,250 | $1,250 | $1,250 | $1,250 | $5,000 | $1,250 | $1,250 | $1,250 | $1,250 | $5,000 | $1,250 | $1,250 | $2,500 | $16,250 |
| **Total Admin Expenses** | $33,542 | $16,042 | $16,042 | $65,626 | $13,792 | $12,292 | $18,292 | $30,042 | $74,418 | $22,442 | $17,442 | $25,042 | $18,192 | $83,118 | $36,992 | $14,842 | $51,834 | $274,996 |
| **Other Administrative Expenses** | | | | | | | | | | | | | | | | | | |
| US Trustee (including $1300 in arrears) | $1,300 | | $1,625 | $2,925 | $500 | $500 | $500 | $500 | $2,000 | | | | | | | $4,875 | $4,875 | $7,800 |
| Moving Truck | | | $250 | $250 | | | | | | | | | | | | $2,000 | $2,000 | $2,250 |
| **Total Other Admin Expenses** | $1,300 | | $1,875 | $3,175 | $500 | $500 | $500 | $500 | $2,000 | | | | | | | $4,875 | $4,875 | $10,050 |
| **TOTAL EXPENSES** | $65,515 | $44,855 | $49,665 | $160,035 | $47,150 | $51,088 | $52,213 | $63,901 | $214,352 | $57,858 | $52,858 | $60,458 | $53,608 | $224,782 | $76,181 | $63,781 | $139,962 | $739,131 |
| **REVENUE*** | | | | | | | | | | | | | | | | | | |
| Sale of obsolete Inventory | $5,000 | | | $5,000 | $10,000 | | | | $10,000 | $12,500 | | | | $12,500 | $15,000 | | $15,000 | $42,500 |
| Trade Product Revenue | $101,223 | | $14,000 | $115,223 | | | | $5,000 | $5,000 | $10,000 | $17,500 | $17,500 | $17,500 | $62,500 | $17,500 | $27,500 | $45,000 | $227,723 |
| Trade Service Revenue | $300 | | $11,648 | $11,948 | | | | $5,000 | $5,000 | $7,500 | $12,500 | $12,500 | $12,500 | $45,000 | $12,500 | $18,750 | $31,250 | $93,198 |
| **TOTAL REVENUE** | $106,523 | $0 | $25,648 | $132,171 | $10,000 | | | $10,000 | $20,000 | $30,000 | $30,000 | $30,000 | $30,000 | $120,000 | $45,000 | $46,250 | $91,250 | $363,421 |
| **Net Income** | $41,008 | ($44,855) | ($24,017) | ($27,864) | ($37,150) | ($51,088) | ($52,213) | ($53,901) | ($194,352) | ($27,858) | ($22,858) | ($30,458) | ($23,608) | ($104,782) | ($31,181) | ($17,531) | ($48,712) | ($375,710) |

* January 2020 relocation  will limit assembly and ability to fill orders

| Operating Cash Requirement | 12/16/2019 | 12/23/2019 | 12/30/2019 | Month | 1/6/2020 | 1/13/2020* | 1/20/2020* | 1/27/2020* | Month | 2/3/2020* | 2/10/2020 | 2/17/2020 | 2/24/2020 | Month | 3/2/2020 | 3/19/2020 | Month | Total 13 Wk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Expenses | $65,515 | $44,855 | $49,665 | $160,035 | $47,150 | $51,088 | $52,213 | $63,901 | $214,352 | $57,858 | $52,858 | $60,458 | $53,608 | $224,782 | $76,181 | $63,781 | $139,962 | $739,131 |
| A/R received | | | | | | | | | | | | $95,871 | | | $23,083 | $9,000 | | $127,954 |
| Operating Cash Requirement | $65,515 | $44,855 | $49,665 | | $47,150 | $51,088 | $52,213 | $63,901 | | $57,858 | $52,858 | ($35,413) | $53,608 | | $53,098 | $54,781 | | $611,177 |
| Equipment | | | | | | | | | | | | | | | | $50,000 | | $50,000 |
| Inventory | | | | | $50,000 | | | | $50,000 | | | | | $50,000 | | | | $150,000 |
| Security Deposits | | | | | $250,000 | | | | $50,000 | | | | | $50,000 | | | | $350,000 |
| Other Cash Requirements | | | | | $300,000 | | | | $100,000 | | | | | $150,000 | | | | |
| **Total Cash Need** | $65,515 | $44,855 | $49,665 | $347,150 | $51,088 | $52,213 | $63,901 | | $157,858 | $52,858 | ($35,413) | $53,608 | | $53,098 | $204,781 | | | $1,161,177 |
| **Cash Need though 1/13/20** | | | | $558,273 | | | | | | | | | | | | | | |